WALTER I. AND PATRICIA A. PHILLIPS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Phillips v. Commissioner
Docket Nos. 20452-87, 20453-87, 20459-87, 20460-87, 20461-87, 20520-87, 15261-88
United States Tax Court
T.C. Memo 1992-175; 1992 Tax Ct. Memo LEXIS 186; 63 T.C.M. (CCH) 2517; March 24, 1992, Filed *186 Decision will be entered under Rule 155. John L. Brennan and Patrick J. Regan, for petitioners.
C. Glenn McLaughlin and David L. Jordan, for respondent. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Petitioners
Year
Deficiency
Residence
Walter I. and Patricia A. Phillips
1982
$  3,396.43
Wichita, Kansas
James H. and Constance M. Hess
1981
8,912.89
McPherson, Kansas
George R. and Evaline Hess
1980
45,959.83
McPherson, Kansas
1981
35,584.92
McPherson, Kansas
Dick Hess and Estate of
Lou Ann Hess, deceased
1981
1,042.80
McPherson, Kansas
David L. and Janet K. Murfin
1979
8,316.07
Wichita, Kansas
Thomas J. and Mary Jill Darrah
1981
3,265.00
Longmont, Colorado
Each of the above petitioners reported, on his or her Federal income tax return for 1981, a share of partnership items from Mallard Joint Venture, a Kansas partnership. After concessions, the sole issue for decision is whether Mallard Joint Venture is allowed investment tax credit on an oil and gas drilling rig and related equipment which was acquired for lease. This *187 issue turns on whether Mallard Joint Venture meets the limitation imposed on noncorporate lessors by section 46(e)(3) with respect to the subject drilling equipment. All section references are to the Internal Revenue Code as amended unless otherwise stated. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein by this reference. The residence of each of the petitioners in these consolidated cases, at the time his or her petition was filed, is set out in the above schedule. During 1980, there was a shortage of oil and gas drilling equipment. This prompted Mr. John Jay Darrah, Jr., who is not a party to any of the subject cases, to investigate the possibility of forming a company for the purpose of acquiring and leasing a drilling rig and related drilling equipment. He discussed the idea with certain business associates who were engaged in the oil and gas business, including Mr. Walter I. Phillips, Mr. James H. Hess, Mr. Dick Hess, Mr. David L. Murfin, Mr. Thomas J. Darrah, and Mr. John W. Sutherland, the principal in a family business, Sutherland Building *188 Materials, Inc. The first five individuals are petitioners in five of the six cases consolidated herein. The sixth individual, Mr. Sutherland, is not a party to any of the subject cases, but he and the four other shareholders of Sutherland Building Material, Inc., a subchapter S corporation, have executed closing agreements under which each of them agrees to be bound by our redetermination of the investment tax credit adjustment at issue herein. References to petitioners throughout this opinion are references to Mr. Darrah's six business associates, enumerated above, and Mr. George R. Hess who is identified below. The record does not fully reveal the family relationships existing among petitioners and among the other individuals referred to herein. However, it appears that Mr. James H. Hess, Mr. George R. Hess, and Mr. Dick Hess are brothers. In pursuit of his idea, Mr. Darrah obtained a quotation dated April 14, 1980, from Continental-Emsco Co. of Tulsa, Oklahoma, for the purchase of a drilling rig and related drilling equipment. The quotation stated that the aggregate purchase price of the rig would be $ 1,084,375.03. Continental-Emsco revised its quotation on or about June *189 12, 1980, but the record does not include a copy of the revised quote. On June 12, 1980, after conferring with his business associates, Mr. Darrah placed an order with Continental-Emsco Co. for the construction and delivery of a drilling rig meeting the specifications set forth in the quotation dated June 12, 1980. By letter dated July 22, 1980, Mr. Darrah wrote to his attorney, Spencer L. DePew, Esquire, outlining the general plan under which he and his business associates contemplated acquiring and using the drilling rig. He asked his attorney to prepare "rough drafts" of certain documents. According to Mr. Darrah's letter, the rig would be purchased in part by an individual, Mr. George R. Hess, who would acquire approximately $ 750,000 worth of the equipment and, in part, by a joint venture which would acquire the remainder of the property. In his letter, Mr. Darrah askes his attorney to prepare two leases for the equipment. The terms of both leases were to be "7 years". Under the first, Mr. Hess would lease his equipment to a drilling company "at a fixed rate of interest" with no principal reduction. Mr. Darrah's letter instructs his attorney to set the original rate of *190 interest at 8 percent. Under the second lease, the joint venture would lease its equipment to the drilling company but, according to the letter, this lease "should be designed to allow for more realistic payments" and should "carry some sort of buy-back provision" at the end of the 7-year term. During the latter part of 1980, Mr. George Hess purchased $ 382,697.50 worth of drilling equipment. He purchased the equipment for use by the Mallard Joint Venture but did not contribute it to the joint venture until 1981. He did not place the equipment in service in 1980. Nevertheless, Mr. George Hess included the $ 382,697.50 worth of drilling equipment on a Form 3468, Computation of Investment Credit, which was attached to his individual income tax return for 1980. Petitioners entered into a joint venture agreement dated November 1, 1980, generally along the lines outlined in Mr. Darrah's letter. Unlike the initial plan, however, Mr. George Hess became a member of the joint venture and eventually increased his investment in the partnership to $ 900,000. The terms of the joint venture agreement create a Kansas general partnership under the name Mallard Joint Venture. The agreement *191 states that the purpose of the joint venture is the "acquisition, maintenance and operation of a drilling rig, substructure and components to be leased to third parties for drilling operations." The agreement provides that the ownership interest of each partner in the joint venture is set forth "on the attached Exhibit 'A'". No such exhibit is attached to the version of the agreement included in the record of this case. The parties agree that the ownership interest of the partners varied from time to time during the first several months after the joint venture was formed due to the timing of each partner's capital contributions to the joint venture. As of approximately June 15, 1981, the capital contributed by each partner and his ownership interest in the joint venture are as follows: George R. Hess
$   900,000.00
65.00%
Dick Hess
96,923.07
7.00%
James H. Hess
96,923.07
7.00%
John J. Darrah
96,923.07
7.00%
Thomas J. Darrah
24,230.77
1.75%
David L. Murfin
72,692.30
5.25%
Innes Phillips
48,461.55
3.50%
Sutherland Building
Materials, Inc.
48,461.55
3.50%
$ 1,384,615.38
100.00%
Paragraph III of the agreement provides: CONDUCT OF JOINT VENTURE *192 All decisions pertaining to the management of the affairs of the joint venture, including but not limited to decisions in respect to operation of the drilling equipment, leasing, professional assistance and loans from financial institutions and additional capital contributions, shall be determined by a vote of the parties with the decision of ninety percent (90%) in interest in the Joint Venture controlling.
On or about November 3, 1980, Mr. John Darrah, Jr. organized Mallard Drilling Co., Inc., a Kansas corporation, the drilling company contemplated by Mr. Darrah's letter of July 22, 1980. We refer to this corporation as Mallard Drilling or the drilling company. Mr. Darrah and his business associates eventually subscribed to the stock of Mallard Drilling in the following amounts: Subscription
Shares
Ownership
Date
John Darrah, Jr.
10,000
20%
2/02/81
Dick Hess
10,000
20%
1/27/81
James Hess
10,000
20%
1/27/81
David L. Murfin
7,500
15%
2/02/81
Walter I. Phillips
5,000
10%
1/23/81
Sutherland Building
Materials, Inc.
5,000
10%
Unknown
Thomas J. Darrah
2,500
5%
2/02/81
50,000
100%
Mr. Darrah acted as president of the drilling company *193 and Mr. James Hess acted as its vice president. Petitioner George Hess did not acquire any stock in the drilling company. He was the only partner in the joint venture who did not. Petitioners George Hess, Dick Hess, James Hess, and David Murfin, acting on behalf of the joint venture, executed a lease dated November 4, 1980, (hereinafter the November lease) in which the joint venture, as "Lessor", undertook to lease "a drilling rig with all components and all other tangible personal property in connection therewith" to the drilling company, as "Lessee". Mr. John Darrah executed the lease, on behalf of the drilling company as its president and his signature was attested to by Mr. Walter Innes Phillips, as secretary. The record does not establish the precise date on which the November lease was executed. It appears that both the November lease and the joint venture agreement, described above, were executed sometime after March 9, 1981. The November lease sets forth the term of the lease and the rent to be paid during that term in the following provisions: 2. TERM. The term of this lease shall be for ten (10) years, effective upon delivery of the leased equipment in sufficient *194 quantity and condition to commence drilling operations. Lessee shall have the option at the end of said ten year period, or before, to purchase the leased equipment from Lessor according to the terms contained in any agreement reached by the parties. 3. RENT. Rental shall be for the term and at rates as follows: (a) For the first three (3) years of this Lease, Lessee agrees to pay to Lessor for use of said equipment an annual rental in an amount equal to eight percent (8%) of the invoice cost of said equipment. * * * Said rental shall be paid in equal monthly installments and shall be payable at the office of Lessor at the close of each month or within ten (10) days thereafter. Rental will be invoiced to Lessee on a monthly basis.
The November lease further provides that the drilling company, the lessee, is responsible for maintaining the equipment and for any related expense of maintenance. It also provides that the drilling company is required to carry comprehensive insurance coverage against the loss, theft, damage, or destruction of the equipment, naming the lessor as the insured and loss payee. The lease further provides that the lessee is to carry liability *195 insurance covering losses that occur as a result of the operation of the rig. Sometime thereafter, petitioners George Hess, Dick Hess, and James Hess, acting on behalf of the joint venture, executed a second lease document, dated May 1, 1981 (hereinafter the May lease), under which the joint venture, as "Lessor", agreed to lease "a drilling rig with all components and all other tangible personal property" to the drilling company, as "Lessee". Mr. Darrah executed the May lease as president. The record does not establish the date on which this lease was executed. The May lease was drafted by Mr. Don Reichenberger, a certified public accountant. Mr. Reichenberger described himself as "the accountant for Hess Oil Company and the Hess family." Significantly, the May lease changes the length of the arrangement and the monthly rent to be paid to the following: 2. TERM. The term of this lease shall be for two (2) years, effective upon delivery of the leased equipment in sufficient quantity and condition to commence drilling operations. 3. RENT. Rental shall be for the term and at rates as follows: $ 11,066.67 per month for a total of $ 132,800.04 per year.
Unlike *196 the November lease, the May lease provides that the joint venture, the lessor, "shall provide up to a maximum of $ 1,000 per month for preventive maintenance expense". Similarly, unlike the November lease, the May lease requires the joint venture, the lessor, to provide and maintain comprehensive insurance coverage against loss, theft, damage, or destruction of the leased equipment. The joint venture determined the monthly rent payment on the basis of the following computation: Mallard Joint Venture Computation of Lease Payments
Investment:
January, 1981
$   440,255.37
February, 1981
36,000.00
March, 1981
33,264.00
April, 1981
90,605.72
May, 1981 (Est)
400,000.00
June, 1981 (Est)
400,000.00
Total invested
1,400,125.09
Multiplied by
8%
Net annual return
112,010.01
Divided by
12
Net Lease payments
9,334.17
Plus:
Maintenance
1,000.00
Insurance
732.50
Lease Payments
$    11,066.67
Thus, the monthly rent under the May lease included $ 1,732.50 per month to compensate the lessor for maintenance and insurance costs. The useful life of the drilling rig and related drilling equipment which the joint venture acquired was 6 years. The rig was *197 delivered by the manufacturer to Mallard Joint Venture in May of 1981 and was the sole asset of the joint venture. It was first placed in service on or about May 12, 1981, when it was used to drill a well. Initially, Mallard Drilling acquired insurance coverage for all risks of physical loss or damage to the leased drilling rig and related equipment. The first insurance policy on the rig was issued by Swett & Crawford in the name "Mallard Drilling Company". The premium for the policy was $ 6,561 and the policy period was from May 1, 1981, to January 26, 1982. On or about June 11, 1981, Swett & Crawford issued an endorsement to the policy which stated, "the correct name of the assured is: 'Mallard Drilling Company, Inc.'". On March 8, 1982, St. Paul Surplus Lines Insurance Co. issued a policy insuring against all risks of direct physical loss of or damages to the drilling rig, up to $ 1,384,000, per occurrence. The policy was issued to "Mallard Joint Venture", effective January 26, 1982. Mallard Drilling made the following rent payments to Mallard Joint Venture during the period May 1, 1981, through June 30, 1982: Date
Amount
Rental Period
6/26/81
$  12,494.28
[1]
9/01/81
9,250.45
[1]
9/30/81
18,606.76
[1]
11/06/81
9,300.74
[1]
12/30/81
32,280.21
[1]
6/04/82
33,200.01
January -- March, 1982
6/18/82
11,066.67
April, 1982
6/29/82
22,133.34
May -- June, 1982
Total
$ 148,332.46
*198 Mallard Joint Venture paid the following expenses with respect to the drilling rig and related equipment during the period May 1, 1981, through June 30, 1982: Date
Amount
Purpose
1/23/81
$     36.10
Bank service charge
10/30/81
4.38
Bank service charge
12/29/81
8,000.00
Maintenance
12/29/81
6,561.00
Insurance
6/29/82
6,000.00
Maintenance
6/29/82
7,764.24
Insurance
Total
$ 28,365.72
On March 16, 1982, Mallard Drilling held a joint meeting of its board of directors and stockholders. After that meeting, Mr. John Darrah made the following note to the file: 3/16/82 Note to Mallard File (FOR FILE ONLY) We discussed the re-vamped JV lease between Mallard & JV. Have to have 15% expense against income to get IRS credit on investment credit. After 1 year this will meet the requirement so for that time JV pays maintenance fee and also some ins.
The joint *199 venture's initial Federal income tax return was due to be filed on its behalf on or about March 15, 1982. The joint venture reports income and expense for Federal income tax purposes using the cash receipts and disbursements method of accounting. On or about December 28, 1983, Mallard Joint Venture and Mallard Drilling executed another lease of the drilling rig (hereinafter the December lease) for a 2-year term beginning on May 1, 1983. The fact that the May lease had expired was called to Mr. George Hess' attention by an Internal Revenue Service agent during an audit of Mr. Hess' individual income tax return for 1981. Mr. Reichenberger first telephoned Mr. Darrah about the problem, and Mr. Hess sent a new lease to Mr. Darrah which was to be executed by him, as president of Mallard Drilling. OPINION The issue in each of these consolidated cases is whether Mallard Joint Venture is eligible for investment tax credit with respect to the oil and gas drilling rig and related equipment which it placed in service in 1981 when it began leasing the rig to Mallard Drilling Co. This issue turns on whether Mallard Joint Venture qualifies under section 46(e)(3), the limitation with respect *200 to noncorporate lessors. That section, as in effect on January 1, 1981, the beginning of the year in issue, provided as follows: (e) Limitations with respect to certain persons. -- * * * * (3) Noncorporate lessors. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such a person is the lessor only if -- (A) the property subject to the lease has been manufactured or produced by the lessor, or (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property. In the case of property of which a partnership is the lessor, the credit otherwise allowable under section 38 with respect to such property to any partner which is a corporation shall be allowed notwithstanding the first *201 sentence of this paragraph. For purposes of this paragraph, an electing small business corporation (as defined in section 1371) shall be treated as a person which is not a corporation. This paragraph shall not apply with respect to any property which is treated as section 38 property by reason of section 48(a)(1)(E).
Section 46(e)(3)(B) was amended by section 211(d) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 228, which added the following new sentence to the end of the provision: "For purposes of subparagraph (B), in the case of any recovery property (within the meaning of section 168), the useful life shall be the present class life for such property (as defined in section 168(g)(2))". The amendment applied to leases entered into after June 25, 1981. Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 211(i)(4), 95 Stat. 172, 235. Since the parties agree that the useful life of the subject drilling rig and related equipment is 6 years, we are not called upon to decide whether the above amendment applies in this case. We note that section 46(e)(3) was also amended by section 5(a)(6) of the Subchapter S Revision Act of 1982, Pub. L. 97-354, *202 96 Stat. 1669, 1692, and by section 1002(a)(15) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3355. Finally, in 1990, section 46 was amended and section 46(e) was removed from the Code by section 11813 of the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, 104 Stat. 1388, 1388-536. In this case, petitioners bear the burden of proving that Mallard Joint Venture qualifies under section 46(e)(3) and is allowed the investment tax credit which it reported for 1981. Rule 142, Tax Court Rules of Practice and Procedure. Accordingly, in this case, petitioners bear the burden of proving that the term of the lease between the joint venture and the drilling company was less than 50 percent of the useful life of the drilling rig and related property. E.g., Hauptli v. Commissioner, 951 F.2d 1193 (10th Cir. 1991), affg. T.C. Memo. 1991-72; Schumacher v. United States, 931 F.2d 650, 653 (10th Cir. 1991); Borchers v. Commissioner, 95 T.C. 82 (1990), affd. 943 F.2d 22 (8th Cir. 1991). This is one of the two requirements of section 46(e)(3)(B) which *203 respondent determined had not been met. Petitioners must also prove that the joint venture's business deductions exceeded 15 percent of the rental income during the first 12 months after the rig was transferred to the drilling company. See Bloomberg v. Commissioner, 74 T.C. 1368, 1372-1373 (1980). This is the second requirement of section 46(e)(3)(B) which respondent determined had not been met. It is well settled that for purposes of the so-called 50-percent test of section 46(e)(3)(B), the length of the lease must be determined at the time the lease or rental begins. Hauptli v. Commissioner, supra; Schumacher v. United States, supra at 653; Hoisington v. Commissioner, 833 F.2d 1398, 1404 (10th Cir. 1987), affg. T.C. Memo. 1984-375; Hokanson v. Commissioner, 730 F.2d 1245, 1248 (9th Cir. 1984), affg. T.C. Memo. 1982-414. To satisfy the burden of proof under that test, a taxpayer must prove that, at the beginning of the leasing arrangement, the parties to the lease had a fixed intention that the lease would terminate before 50-percent of *204 the useful life of the asset had expired. Hauptli v. Commissioner, supra; Schumacher v. United States, supra at 653. We find that petitioners failed to meet their burden of proof under the so-called 50 percent test of section 46(e)(3)(B). They did not prove that, at the beginning of the leasing arrangement, the term of the lease was less than 50 percent of the useful life of the property. For that reason alone, Mallard Joint Venture is not allowed investment tax credit with respect to the subject drilling rig and we need not address the other issues raised by respondent. See Hauptli v. Commissioner, supra; Schumacher v. United States, supra.
To prove the term of the leasing arrangement between the joint venture and the drilling company, petitioners introduced into evidence the May lease and the testimony of Mr. Don Reichenberger, a certified public accountant, who was employed by Hess Oil Co. and certain members of the Hess family. As mentioned above, the May lease provides that the term of the lease is "two (2) years". Mr. Reichenberger testified that the May lease was "the lease *205 under which the first well was drilled in May of 1981". He testified that all of the rent paid by the drilling company was the rent specified by the May lease, $ 11,066.67 per month. He stated that the November lease, which provides a term of 10 years, "was mainly a planning tool" and that the November lease had been discarded before the first well was drilled. Mr. Reichenberger was the only witness to testify at trial. Based solely upon his testimony, petitioners argue, "the witness' unrebutted testimony is that the first well was drilled in the middle of May, 1981, under the May lease, and that the November document was never used by the parties as a working lease". Based on the fact that the stated term in the May lease is 2 years, petitioners argue that the term of the lease is less than 50 percent of the useful life of the property (i.e. less than 3 years), and they argue that respondent "has failed to point to any evidence that establishes that the lease of the drilling equipment dated May 1, 1981, for a term of two years, was actually of indefinite duration." We listened closely to Mr. Reichenberger's testimony that the May lease was in place at the commencement of the *206 leasing transaction and we observed his demeanor. We found his testimony to be vague and conclusory in nature, and we do not credit his testimony on that point. For example, he offered no explanation for the fact that the November lease had been formally executed, on behalf of the joint venture, by George R. Hess, Dick Hess, James H. Hess, and David Murfin, and, on behalf of the drilling company, by John J. Darrah, Jr., its president, whose signature was also attested to by Walter Innes Phillips, acting as secretary. It would seem unusual for a "planning tool" to have been formally executed in that fashion. More significantly, Mr. Reichenberger was unable to explain the disparity between the monthly rental payments booked by the joint venture and the payments called for under the May lease. At one point, in response to questions from respondent's counsel, he made the offhand statement, "I don't have my work sheets with me here". At another point, he stated, "Well, I would have to see my worksheets". Later, he refused to answer respondent's counsel with the statement, "I don't have a calculator". There is nothing in the record other than Mr. Reichenberger's testimony to prove *207 that the May lease, as opposed to the November lease, governed the transaction between the joint venture and drilling company at the time the rig was placed in service. In fact, what evidence there is supports respondent's position that the November lease was actually used by the joint venture for 7 or 8 months and that the May lease was drawn up, as an afterthought, in an attempt to claim eligibility for investment tax credit on the drilling rig. For example, we start with the point that Mr. Reichenberger was not able to explain to respondent's counsel, the rental payments received by the joint venture during 1981. The entries in the joint venture's general ledger suggest that the monthly rent payments made by the drilling company from May through November of 1981 were computed under the November lease. According to the general ledger, the following rental payments were booked during 1981: Rent
DEP
6/26/81
$ 12,494.28
July Rent
ADJ
9/01/81
9,250.45
September Rent
ADJ
9/30/81
9,303.38
August Rent
ADJ
9/30/81
9,303.38
0
DEP
11/06/81
9,300.74
0
DEP
12/30/81
32,280.21
$ 81,932.44
Under the May lease, each monthly payment should have been $ 11,066.67, *208 rather than the above amounts, and the total rent for 8 months of 1981 should have been $ 88,533.36, rather than $ 81,932.44 the aggregate amount booked in the general ledger for 1981. Furthermore, under the November lease, the annual rent for the rig is stated to be "equal to eight percent (8%) of the invoice cost" of the equipment. We note that the rental payment booked as a deposit on November 6, 1981, $ 9,300.74, appears to have been computed for the month of October 1981, as follows: General ledger for December
1981 -- equipment entries:
Equipment
$ 1,180,453.45
Equipment
11,483.83
Equipment
140,800.85
Equipment
3,905.04
Equipment
39,847.92
1,376,491.09
Reverse Oct. entries:
10/19/81
14,620.23
10/26/81
4,000.00
Invoice cost of equipment
at beginning of October 1981:
1,395,111.32
8.00%
111,608.91
/12
Rental payment shown
as deposit on 11/06/81:
$    9,300.74
Therefore, contrary to Mr. Reichenberger's testimony, it appears that the rental payment booked to the joint venture's general ledger as a deposit on November 6, 1981, was computed under the November lease. We infer from this that the November lease was still being used *209 by the parties at that time. A second difference between the two leases is the fact that the November lease provides that the lessee, the drilling company, "shall provide and maintain comprehensive insurance coverage against loss, theft, damage, or destruction of the leased equipment, naming Lesser as the insured and loss payee". The May lease, on the other hand, requires the lessor, the joint venture, to provide such coverage. Nevertheless, contrary to the provisions of the May lease and consistent with the provisions of the November lease, the lessee, the drilling company, obtained comprehensive insurance coverage for the drilling rig and related equipment for the period beginning May 1, 1981, and ending January 26, 1982. An endorsement to the policy covering that period was issued on June 11, 1981, and states, "that effective from the date of inception of this policy May 1, 1981, the correct name of the assured is: 'Mallard Drilling Company, Inc.'". We note that it was not until March 8, 1982, that the lessor, Mallard Joint Venture, obtained insurance on the drilling rig and related equipment, as contemplated by the May lease. Based upon the above, we find that the November *210 lease governed the subject leasing transaction between the joint venture and the drilling company when the drilling rig was placed in service in May of 1981 and continued to govern the transactions until sometime after November 6, 1981. Thus, petitioners have failed to prove, as required by section 46(e)(3)(B), that at the beginning of the leasing arrangement the parties had a fixed intention to terminate the lease before 50 percent of the useful life of the drilling equipment had expired. See Hauptli v. Commissioner, 951 F.2d 1193 (10th Cir. 1991); Schumacher v. United States, 931 F.2d at 653. Accordingly, we sustain respondent's determination that Mallard Joint Venture is not eligible for investment tax credit on the subject drilling rig and related equipment placed in service during the year 1981. Based upon concessions by the parties, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated for trial, briefing, and opinion: James H. Hess and Constance M. Hess, docket No. 20453-87; George R. Hess and Evaline Hess, docket Nos. 20459-87 and 20460-87; Dick Hess and Estate of Lou Ann Hess, Deceased, Dick Hess, Executor, docket No. 20461-87; David L. Murfin and Janet K. Murfin, docket No. 20520-87; and Thomas J. Darrah and Mary Jill Darrah, docket No. 15261-88.↩
1. The rent payments made on 6/26/81, 9/01/81, 9/30/81, 11/06/81 and 12/30/81, cover the period of May 1981 through December 1981.↩